**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FT. LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

In re:                                                    Case No.: 17-23651-SMG

**FALLING LEAVES RECOVERY, LLC,**

     **Debtor.**
_____/

**SONIA SALKIN, as Chapter 7 Trustee**              Adv. Case No. 19-01086-SMG
**for Falling Leaves Recovery, LLC,**

     **Plaintiff,**
**v.**

**MARK SHEPPARD,**

     **Defendant.**
_____/

**DEFENDANT MARK SHEPPARD'S ANSWER AND AFFIRMATIVE DEFENSES**
**TO AMENDED ADVERSARY COMPLAINT [ECF 34]**

     The Defendant Mark Sheppard ("Sheppard"), through undersigned counsel, files his Answer and Affirmative Defenses to the Amended Adversary Complaint of Sonia Salkin ("Salkin") , as Chapter 7 Trustee for Falling Leaves Recovery, LLC (the "Debtor").

**ANSWER**

**Background**

1.     Admitted.

2.     Admitted.

3.     Admitted.

**Parties, Jurisdiction and Venue**

4.     Admitted.

5.     Admitted.

6.     Admitted.

7.    Denied that the matter is core.  Sheppard has no knowledge of what Salkin has agreed to do.

**General Allegations**

8.    Admitted.

9.    Admitted.

10.    Admitted.

11.    Admitted.

12.    Admitted, but Sheppard hired various professionals experienced in these matters to advise him, including a CEO with 35 years' experience in the rehabilitation and recovery industry. These facts were well-known to TCRG Opportunity IV, LLC ("TCRG") and the Debtor's other significant creditors, before any extended credit to the Debtor.

13.    Admitted, but this fact was known to the Debtor's significant creditors, including TCRG before any extended any credit to the Debtor.

14.    Denied.

15.    Denied.

16.    Denied.

17.    Denied.

18.    Denied.

19.    Denied.

20.    Admitted.

21.    Admitted that the Debtor planned to operate its addiction rehabilitation and recovery business at the Casa Bella premises, but denied that the Debtor ever operated from that facility.  The Debtor's addiction rehabilitation and recovery business was operated from elsewhere, in Miami Lakes, where the Debtor had all of the necessary permits and licenses, where its patients received their treatments.  The patients slept when not in treatment at the Casa Bella premises, which had been and was authorized for such use.   This was planned as temporary until the business tax license was obtained from Miami Gardens, at which time the treatments would also take place at the Casa Bella premises.  That never happened because Miami Gardens unlawfully denied the Debtor its business tax license.

22.    Admitted.

23.    Denied.

24.    Admitted.

25.    Admitted.

26.    Admitted.

27.    Admitted.

28.    Denied.

29.    Denied.

30.    Denied.

31.    Admitted that the citations were issued, but the Debtor was not operating at the Casa Bella location, and never had.  The citations were not accurate.  Otherwise, denied.

32.    Denied.

33.    Denied.

34.    Denied.

35.    Denied.

36.    Denied.

37.    Admitted.

38.    Denied.

39.    Admitted, though Sheppard had communicated to TCRG beforehand that the Debtor lacked the ability to undertake this financial commitment.  TCRG stated it needed the Debtor to sign the TCRG lease so that TCRG could obtain a construction loan.  TCRG represented that after it obtained its construction loan, TCRG would lease the premises to another if the Debtor could not perform.

40.    Admitted, though all of this was communicated to TCRG beforehand as set froth above.

41.    Denied.

42.    Denied.

43.    Denied.

44.    Denied.

45.    Denied.

46.    Denied.

47.    Denied.

48.     Denied.

49.    Denied.

50.    Denied.

51.    Denied.

52.    Admitted.

53.    Denied.

54.    Admitted.

55.    Admitted.

56.    Admitted.

57.    Admitted.

58.    Admitted.

59.    Admitted.

60.    Denied.

61.    Denied.  TCRG's counsel asked to be hired by Salkin and TCRG is paying all attorneys' fees and costs for this matter.

62.    Denied.

## Count I

63.    Sheppard's responses above are incorporated in response to the incorporated allegations.

64.    Admitted.

65.    Admitted.

66.    Denied.

67.    Denied.

68.    Denied.

69.    Denied.

70.    Denied.

71.    Denied.

72.    Denied.

73.    Denied.

74.    Denied.

75.    Denied.

76.    Denied.

77.    Denied.

78.    Denied.

## Count II

79.    Sheppard's responses above are incorporated in response to the incorporated allegations.

80.    Admitted.

81.    Admitted.

82.    Denied.

83.    Denied.

84.    Denied.

85.    Denied.

86.    Denied.

87.    Denied.

88.    Denied.

89.    Denied.

90.    Denied.

91.    Denied.

92.    Denied.

93.    Denied.

94.    Denied.

95.    Denied.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense-Business Judgment Rule (Nev. Rev. Stat. § 78.138)

Nevada's business judgment rule, as codified in Nev. Rev. Stat. § 78.138, absolves Sheppard from any liability.  Sheppard is presumed to have acted in good faith, on an informed basis, and in the best interests of the Debtor under subsection (3).  Specifically, at all times, Sheppard (1) acted in a good faith belief that his conduct was in the Debtor's best interests and in the best interests of its creditors; (2) exercised due care in ascertaining the relevant facts and law before acting; and (3) did not act in self-interest.

In light of this presumption of good faith, Sheppard cannot be liable in his individual capacity for breach of fiduciary duty unless this presumption is rebutted, and such breach involves

intentional misconduct, fraud, or a knowing violation of the law under subsection (7), none of which is present in this case.

With respect to the Casa Bella — Toy 14, Inc. ("Casa Bella") lease, Sheppard at all times sought out, received, and acted in accordance with the advice of professionals, including CPAs and attorneys with respect to opening, operating, obtaining licenses, and in all other dealings with respect to Casa Bella.  With respect to the actual operations of the Debtor, Sheppard hired individuals on behalf of the Debtor who were experienced in operating rehabilitation and recovery facilities.  Sheppard cause the Debtor to operate legally at all times.  The Debtor's parties received their additional rehabilitation and treatment at a Miami Lakes facility where the Debtor had all of its necessary permits and licenses, with the patients sleeping at the Casa Bella premises when not in treatment, which was legal as Casa Bella was a hotel property.  This was intended by the Debtor to be temporary until the Debtor received its business tax license from Miami Gardens, but that was unlawfully denied so the operations never moved to the Casa Bella premises.

With respect to the TCRG lease, TCRG was well aware before the lease was entered into that the Debtor may not be able to comply with its financial terms.  The Debtor and Sheppard made full financial disclosures to TCRG beforehand.  TCRG ask Sheppard to personally guarantee the TCRG lease, but Sheppard declined.  TCRG represented it needed the lease signed by the Debtor urgently whether the Debtor could comply with its terms or not because TCRG needed a construction loan for its property.  TCRG represented it would re-lease the premises after the construction loan was obtained, and the Debtor would not be responsible if it could not comply.  TCRG represented it had four to five other tenants waiting to lease the premises.

<u>Second Affirmative Defense-Compliance with Operating Agreement</u>

Sheppard at all times complied with the terms of the Debtor's Operating Agreement which is attached as Exhibit "A."

<u>Third Affirmative Defense-Lack of Causation</u>

Any loss or damage to the Debtor or its creditors that is the subject of the Amended Complaint is not the result of any actions of Sheppard.  The Debtor's business failed and it was unable to pay its creditors was the result of Miami Gardens denying the Debtor a business tax license, despite the Debtor being legally entitled to one.  Sheppard hired one of the leading law firms in that industry and was assured the business tax license could not be legally denied. Everyone was shocked that it was not.  Salkin dropped the appeal of that decision in part because

she questioned its merit, but why she questioned the merits is unknown to Sheppard.  Additionally, any loss to TCRG, who is funding this litigation, who is the Debtor's largest creditor, and for whose benefit the Amended Complaint was brought, suffered no losses caused by the Sheppard. TCRG used the lease with the Debtor to obtain a construction loan on its building, and that was TCRG's sole purpose in obtaining that lease, not to be paid by the Debtor.  Despite the Debtor's default and TCRG obtaining an accelerated lease default judgment, TCRG re-leased the real property almost immediately and suffered no financial harm on account of any actions of Sheppard.

<u>Fourth Affirmative Defense-Salkin has no Standing</u>

Salkin lacks standing to bring these claims.  Salkin does not have standing to bring claims of specific creditors, which is all the Amended Complaint seeks to do.  The Casa Bella lease's landlord recognized the financial risks associated with the Debtor and accordingly demanded, and received, a limited personal guarantee from Sheppard with regard to the Casa Bella lease. Sheppard satisfied that obligation.  Whatever losses the Casa Bella landlord may have suffered from any wrongdoing of Sheppard as managing member of the Debtor, Casa Bella has fully compensated.  The only creditor left even mentioned by Salkin in the Amended Complaint is TCRG.  The Amended Complaint attempts to claim damages on behalf of the Debtor and/or its creditors, but simply sounds in unpaid accelerated lease obligations of two landlords, one of which (Casa Bella) obtained a personal guarantee which was satisfied.  The  other TCRG released it almost immediately and suffered no harm.  These are claims of the landlords, not the Trustee.  The Trustee does not differentiate between damages to two creditors, and damages to the Debtor.

Sheppard anticipates that discovery will reflect that neither Salkin, nor her professionals, nor TCRG has reached out to any creditor of the Debtor to ascertain the veracity of the allegations in the Amended Complaint.

<u>Fifth Affirmative Defense-Sheppard's Reliance on Professionals</u>

Sheppard at all times when acting for the Debtor sought and relied upon the advice of CPAs and legal counsel.  Even if the advice turned out to be erroneous, Sheppard sought, obtained, and relied upon it in good faith.

<u>Sixth Affirmative Defense-*In Pari Delicto*</u>

TCRG asked Salkin to bring this action on her behalf, after she ostensible did not see sufficient merit in it to hire her usual professionals.  TCRG is funding this litigation.  TCRG is the

largest creditor in this action.  The allegations of the Amended Complaint suggest, if not reflect, that neither Salkin nor TCRG has made any contact or had any communication at all with any of the Debtor's other creditors as to the merits of the allegations in the Amended Complaint, or their dealings with the Debtor or Sheppard.  TCRG asked the Debtor to enter into its lease fully aware that the Debtor was unlikely to be able to perform financially because TCRG sought to use the Debtor's lease to obtain a construction loan on the property.  TCRG represented that it could use the Debtor's lease to obtain that construction loan, needed to do so urgently, and once that occurred, TCRG would let the Debtor out of the lease if it could not comply.   Whatever wrongdoing TCRG now wants to pursue against Sheppard was equaled, if not exceeded by, TCRG itself.  To the extent the Court finds that TCRG is the real party in interest, or to the extent Salkin seeks any damages related to the Debtor's transactions with TCRG, those claims and damages are barred by the *In Pari Delicto* doctrine.

Seventh Affirmative Defense-Lack of Self-Interest

Sheppard opened and operated the Debtor out of a genuine interest to help others based on his family's experiences.  Sheppard put more the $1.5 million of his own money into the Debtor and ran it full-time without any compensation to himself for the entire time it operated.  When the Court dismissed Salkin's Count II for Deepening Insolvency in her original complaint because she had not made the necessary allegations of fraud or self-dealing by Sheppard, she voluntarily dropped that claim, unable to uncover a single shred of evidence to support such conduct despite TCRG hiring professionals in this case with unlimited budgets, substantial retainers, with payment not dependent upon any recovery in this case.

Eighth Affirmative Defense-Waiver

TCRG asked Salkin to bring this action on her behalf, after she ostensible did not see sufficient merit in it to hire her usual professionals.  TCRG is funding this litigation.  TCRG is the largest creditor in this action.  The allegations of the Amended Complaint suggest, if not reflect, that neither Salkin nor TCRG has made any contact or had any communication at all with any of the Debtor's other creditors as to the merits of the allegations in the Amended Complaint, their dealings with the Debtor or Sheppard.  TCRG asked the Debtor to enter into its lease fully aware that the Debtor was unlikely to be able to perform financially because TCRG sought to use the lease to obtain a construction loan on the property.  TCRG represented that it could use the Debtor's lease to obtain that construction loan, needed to do so urgently, and once that occurred,

TCRG would let the Debtor out of the lease if it was unable to perform.  To the extent the Court finds that TCRG is the real party in interest, or to the extent Salkin seeks any damages related to the Debtor's transactions with TCRG, those claims have been waived.

Ninth Affirmative Defense-Unclean Hands

TCRG asked Salkin to bring this action on her behalf, after she ostensible did not see sufficient merit in it to hire her usual professionals.  TCRG is funding this litigation.  TCRG is the largest creditor in this action.  The allegations of the Amended Complaint suggest, if not reflect, that neither Salkin nor TCRG has made any contact or had any communication at all with any of the Debtor's other creditors as to the merits of the allegations in the Amended Complaint, their dealings with the Debtor or Sheppard.  TCRG asked the Debtor to enter into its lease fully aware that the Debtor was unlikely to be able to perform financially because TCRG sought to use the lease to obtain a construction loan on the property.  TCRG represented that it could use the Debtor's lease to obtain a construction loan, needed to do so urgently, and once that occurred, TCRG would let the Debtors out of the lease if it was unable to perform.  Yet, TCRG sued the Debtor when it could not perform.  TCRG has acted unethically and in bad faith.  To the extent the Court finds that TCRG is the real party in interest, or to the extent Salkin seeks any damages related to the Debtor's transactions with TCRG, TCRG's unclean hands prevent recovery.

Tenth Affirmative Defense-Estoppel

TCRG asked Salkin to bring this action on her behalf, after she ostensible did not see sufficient merit in it to hire her usual professionals.  TCRG is funding this litigation.  TCRG is the largest creditor in this action.  The allegations of the Amended Complaint suggest, if not reflect, that neither Salkin nor TCRG has made any contact or had any communication at all with any of the Debtor's other creditors as to the merits of the allegations in the Amended Complaint, their dealings with the Debtor or Sheppard.  TCRG asked the Debtor to enter into its lease fully aware that the Debtor was unlikely to be able to perform financially because TCRG sought to use the lease to obtain a construction loan on the property.  TCRG represented that it could use the Debtor's lease to obtain a construction loan, needed to do so urgently, and once that occurred, TCRG would let the Debtors out of the lease if it was unable to perform.  Sheppard reasonably relied on those statements, and now TCRG is changing its position to Sheppard's detriment by suing the Debtor and now pursuing Sheppard in this action.  To the extent the Court finds that

9

TCRG is the real party in interest, or to the extent Salkin seeks any damages related to the Debtor's transactions with TCRG, Salkin is estopped from that recovery.

Eleventh Affirmative Defense-No Unlawful Acts

The Debtor never illegally operated any business.  Sheppard never engaged in any illegal actions.  When the Debtor sought to obtain a business tax license for its anticipated Miami Gardens location, the Debtor opened a facility in Miami Lakes that had all the proper permits and where its patients received all of their treatments.  The Debtor was only using the Miami Gardens location as a housing facility for the patients when not receiving treatment.  The Miami Gardens location had been and was still set up and authorized to be a hotel.  Housing the patients there when not in treatment in Miami Lakes was legal.

Twelfth Affirmative Defense-Nev. Rev. Stat. § 86.371

Sheppard is not liable for any obligations of the Debtor by virtue of his acts taken as manager within his role as manager.  Salkin alleges nowhere that Sheppard took any actions outside his role as manager acting in that capacity.

Thirteenth Affirmative Defense-No Damages

Salkin's damage claims are reliant upon two defaulted leases of the Debtor.  Salkin does not alleges any damages to the Debtor apart from individual damages to two creditors.  The Casa Bella landlord considers itself paid in full due to the personal guarantee it demanded from Sheppard and which has been satisfied.  TCRG was aware the Debtor was unlikely to be able to perform it lease, but wished to use the lease to obtain a construction loan.  TCRG re-leased the premises and has suffered no damages attributable to Sheppard or to the Debtor.

WHEREFORE the Defendant Mark Sheppard pray this Honorable Court will dismiss the Amended Complaint with prejudice, enter a judgment in his favor and against Sonia Salkin, as Chapter 7 Trustee for Falling Leaves Recovery, LLC, award him his costs, and grant such other relief as the Court deems appropriate.

I HEREBY CERTIFY that I am admitted to the Bar of the United States District Court for the Southern District of Florida, and I am in compliance with the additional qualifications to practice in this Court as set forth in Local Rule 2090-1(A).

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed via electronic filing using CM/ECF systems with the Clerk of the Court, which sent e-mail notifications of such filing to all CM/ECF participants in this case, this the 24th day of October, 2019.

**STEVEN FENDER PA**

*/s/ G. Steven Fender*
G. STEVEN FENDER, ESQ.
Florida Bar No. 060992
Attorney for Defendant Mark Sheppard
P.O. Box 1545
Ft. Lauderdale, FL 33302
Telephone: (407) 810-2458
Email: steven.fender@fender-law.com

## Operating Agreement for Falling Leaves Recovery, LLC A

### Nevada Limited Liability Company

This Operating Agreement (the "Agreement") is made effective as of November *27*. 2015 by and among and Members (the "Members") identified in Exhibit A.

In consideration of the mutual covenants and conditions herein, the Members agree as follows:

### ARTICLE I

### ORGANIZATION

**1.1 Formation and Qualification.** The Members have formed a limited liability company (the "Company") under the laws of the State of Nevada by filing Articles of Organization with the Nevada Secretary of State.

**1.2 Governing Law.** This Agreement shall be governed by and construed and interpreted in accordance with the laws of the State of Texas without regard to Texas conflicts of laws principles. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that any provision of this Agreement is inconsistent with any provision of the Act, this Agreement shall govern to the extent permitted by the Act.

**1.3 Name.** The name of the Company shall be "Falling Leaves Recovery, LLC." The business of the Company may be conducted under that name or, on compliance with applicable laws, any other name that the Members deem appropriate or advisable. The Members on behalf of the Company shall file any certificates, articles, fictitious business name statements and the like, and any amendments and supplements thereto, as the Members consider appropriate or advisable.

**1.4 Term.** The term of the Company commenced on the filing of the Articles of Organization and shall be perpetual unless dissolved as provided in this Agreement.

**1.5 Office and Agent.** The principal office of the Company shall be at such place or places of business within or without the State of Florida as the Members may determine. The Company shall continuously maintain a registered agent in the State of Nevada as required by Nevada law. The registered agent shall be as stated in the Certificate or as otherwise determined by the Members.

**1.6 Purpose of Company.** The purpose of the Company is to engage in all lawful activities, including, but not limited to the following activities: Comprehensive adult program incorporating medical management, 12 step recovery concepts, Individual, group and family therapy, nutrition and wellness therapy, experiential therapies, continuum of care services and success based outcome studies, 24/7 monitored care by highly trained and credentialed physicians, nurses, clinicians and technicians

### ARTICLE II

### MEMBERSHIP INTERTESTS, VOTING AND MANAGEMENT

**Section 2.1 Classification of Membership Interests.** Of the Members, only Mark Sheppard is a founding member and owner of all Class A Membership Units ("Founding Member"). The Founding Member, no matter the percentage ownership of the Company that the Founding Member owns at any time shall have 2/3 of all seats on the Board of Managers. All other Members, whether included on Exhibit A or who become Members at a later time shall be Class B Membership Unit members and shall have the same rights and obligations as all other Class B Membership Unit Members.

**Section 2.2 Percentage Ownership and Voting Interests.** A Member's interest in the Company

EXHIBIT "A"

shall be determined by the number of Membership Units in the Company ("Units") each Member owns, whether Class A or Class B Membership Units. The voting rights shall be determined as follows: The Founding Member shall, at all times, get 2/3 of all voting rights and may exercise the voting rights of 2/3 of the Units at all times, no matter the share of Units the Founding Member owns. The Class B Membership Unit owners shall have a 1/3 voting right determined on a pro-rata basis by taking the number of Units each Member has over the number of outstanding Units issued not owned by the Founding Member.

**Section 2.3 Management by Managers.** The Company shall be managed by a 3 person Board of Managers. As stated in Section 2.1 above, the Founding Member shall vote appoint 2 of the three members while the remaining members shall be appointed by a majority of the Class B Membership Unit owners. The Board of Managers may appoint and remove individuals from key management positions in the company with the unanimous approval of the Board of Managers. Decisions relating to the hiring, firing, payroll benefits, capital expenditures, health insurance, 401(k) and other employee benefits shall require 2/3 of the Board of Managers for approval, but if the vote on such matters is less than unanimous, then such decisions shall be within 20% of generally accepted industry standards for the chemical abuse rehabilitation industry (as determined by US Census Bureau data for the area where the Company facilities are located for 2013-2014). All other matters, not addressed herein, shall require 2/3 of the Board of Managers to be approved.

**Section 2.4 Voting.** Except as otherwise provided or permitted by this Agreement, Members shall in all cases, in their capacity as Members or Managers of the Company, act collectively, and, unless otherwise specified or permitted by this Agreement, unanimously. The Founding Member and/or one employee of the Founding Member's choosing (known as the "Operating Managers") shall have the right to sign for, bind or act on behalf of the Company in any way, to pledge the Company's credit, or to render the Company liable for any purpose related to the day to day running of the Company, including contracts, employment decisions, payment of regularly occurring bills and other accounts but only if they relate to the day to day operation of the Company. Except as otherwise provided or permitted by this Agreement, only the Board of Managers and/or the Operating Managers shall have the right to have any power or authority to sign for, bind or act on behalf of the Company in any way, to pledge the Company's credit, or to render the Company liable for any purpose. Except as otherwise provided or permitted by this Agreement, a Member acting individually, in their capacity as a Member or Manager of the Company, shall not have any power or authority to sign for, bind or act on behalf of the Company in any way, to pledge the Company's credit, or to render the Company liable for any purpose.

**Section 2.5 Liability of Members.** All debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member.

**Section 2.6 New Members.** The Members may admit a new Member or Members, as the case may be, to the Company, only if such new Member (i) is approved unanimously by the Members; (ii) delivers to the Company his required capital contribution (is any); (iii) agrees in writing to be bound by the terms of this Agreement by becoming a party hereto; and (iv) delivers such additional documentation as the Members shall reasonably require to so admit such new Member to the Company.

## ARTICLE III

## PURCHASE AGREEMENT(S)

**3.1** The terms of the Purchase Agreement(s), identified and listed in Exhibit B, attached hereto, shall apply and differences between this Agreement and the Operating Agreement shall be resolved in favor of the Purchase Agreement(s). The initial cash contribution by the Members is outlined in the Purchase Agreement(s) and no other cash or capital contributions shall be required by the Company, except as agreed by the all of the Members.

# ARTICLE IV MANNER OF

## ACTING

**4.1 Officers and Agents of the Company.** The Members may not authorize any Member or Members of the Company, or other individuals or entities, whether or not a Member, to take action on behalf of the Company. Any Member may lend money to and receive loans from the Company, act as an employee, independent contractor, lessee, lessor, or surety of the company, and transact any business with the Company that could be carried out by someone who is not a Member; and the Company may receive from or pay to any Member remuneration, in the form of wages, salary, fees, rent, interest, or any form that the Members deem appropriate upon approval of the Board of Managers.

The Board of Managers may appoint officers of the Company who, to the extent provided by the Board of Managers, may have and may exercise all the powers and authority of the Members or Managers in the conduct of the business and affairs of the Company. The officers of the Company may consist of a President, a Treasurer, a Secretary, or other officers or agents as may be elected or appointed by the Board of Managers. The Board of Managers may provide rules for the appointment, removal, supervision and compensation of such officers, the scope of their authority, and any other matters relevant to the positions. The officers shall act in the name of the Company and shall supervise its operation, within the scope of their authority, under the direction and management of the Members.

Any action taken by a duly authorized officer, pursuant to authority granted by the Board of Managers in accordance with this Agreement, shall constitute the act of and serve to bind the Company, and each Member hereby agrees neither to dispute such action nor the obligation of the Company created thereby.

**4.2 Meetings of Members.** Quarterly meetings of Members are required to be held. Any action that may be taken at a meeting of Members may be taken without a meeting by written consent of all Members. Meetings of the Members, for any purpose or purposes, may be called at any time by a majority of the Members, or by the President of the Company, if any. The Members may designate any place as the place of meeting for any meeting of the Members. If no designation is made, the place of meeting shall be the principal place of business of the Company.

**4.3 Notice of Meetings.** In the event that a meeting of the Members is called, written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than five nor more than sixty business days before the date of the meeting unless otherwise provided, either personally or by mail, by or at the direction of the Members calling the meeting, to each Member. Notice of a meeting need not be given to any Member who signs a waiver of notice or a consent to holding the meeting or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting, prior thereto or at its commencement, the lack of notice to such Member.

**4.4 Record Date.** For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, the date on which notice of the meeting is provided shall be the record date for such determination of the Members. When a determination of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

**4.5 Quorum.** Members holding at least 66% of the Units issued by the Company represented in person, by telephonic participation, or by proxy, shall constitute a quorum at any meeting of Members. In the absence of a quorum at any such meeting, a majority of the Members so represented may adjourn the meeting from time to time for a period not to exceed sixty days without further notice. However, if the adjournment is for more than sixty days, or if after the adjournment a new record date is fixed for another meeting, a notice of the adjourned meeting shall be given to each Member. The Members present at a duly organized meeting may continue to transact business only as previously

provided on the agenda until adjournment, notwithstanding the withdrawal during such meeting of that number of Members whose absence would cause less than a quorum.

**4.6 Voting.** If a quorum is present, a unanimous vote of the Members so represented shall be the act of the Members or Managers, unless the vote of a lesser proportion or number is otherwise required by the Act, by the Certificate or by this Agreement.

## ARTICLE V ALLOCATIONS
## AND DISTRIBUTIONS

**5.1 Allocations of Profits and Losses.** The Profits and Losses shall be allocated among the Members in proportion to their Percentage Ownership Interests absent other provisions in the Purchase Agreement(s) (which will control over this Operating Agreement). Any special allocations necessary to comply with the requirements set forth in Internal Revenue Code Section 704 and the corresponding Regulations, including, without limitation, the qualified income offset and minimum gain chargeback provisions contained therein, shall be made if the Members deem these actions to be appropriate.

**5.2 Distributions.** Unless the terms of the Purchase Agreement(s) determine the allocation of Profits and Losses (which will control over this Operating Agreement), subject to applicable law and any limitations elsewhere in this Agreement, the Board of Managers shall determine the amount and timing of all distributions of cash, or other assets, by the Company, which shall be made at least annually. Except as otherwise provided in this Agreement, all distributions shall be made to all of the Members, in proportion to their Percentage Ownership Interests. Except as otherwise provided in this Agreement, the decision as to whether to make distributions shall be within the sole discretion of the Members.

All such distributions shall be made only to the Members who, according to the books and records of the Company, are the holders of record on the actual date of distribution. The Members may base a determination that a distribution of cash may be made on a balance sheet, profit and loss statement, cash flow statement of the Company or other relevant information. Neither the Company nor the Members shall incur any liability for making distributions.

**5.3 Form of Distribution.** No Member has the right to demand and receive any distribution from the Company in any form other than money. No Member may be compelled to accept from the Company a distribution of any asset in kind in lieu of a proportionate distribution of money being made to other Members except on the dissolution and winding up of the Company.

## ARTICLE VI
## TRANSFER AND ASSIGNMENT OF INTERESTS

**6.1 Resignation of Membership and Return of Capital.** For a period of three (3) years after the Articles of Organization for the Company are filed ("the filing"), no Member may voluntarily resign his membership in the Company, and no Member shall be entitled to any return of capital from the company, except upon the written consent of all of the other Members except as provided for in the Purchase Agreement(s).. After the end of the three year period, a Member may voluntarily resign his membership and shall be entitled to receive from the Company the fair market value of his Ownership Interest, adjusted for profits and losses to the date of resignation. Fair market value may be determined informally by unanimous agreement of all of the Members, including the resigning Member. In the

absence of an informal agreement as to fair market value, the Members shall hire an appraiser to determine fair market value. The cost of any appraisal shall be deducted from the fair market value to which the resigning Member is entitled. The other Members may elect, by written notice that is provided to the resigning Member within thirty (30) days after the resignation date, for the Company to purchase the resigning Member's Interest (whether the interest is being purchased at book value or fair market value) in four (4) equal annual installments, with the first installment being due sixty (60) days after the Member's resignation.

**6.2 Death of a Member.** Except for the death of the Founding Member, upon the death of a Member, the Member's estate or beneficiary or beneficiaries, as the case may be, shall be entitled to either a. receive from the Company, in exchange for all of the deceased Member's Ownership Interest, the fair market value of the deceased Member's Ownership Interest, adjusted for profits and losses to the date of death or b. receive the Units, including all rights and obligations arising from such Units, of the Member and continue to own the Units until they are transferred as per this Agreement. Fair market value may be determined informally by a unanimous good-faith agreement of all of the Members. In the absence of an informal agreement as to fair market value, the Members shall hire an appraiser to determine fair market value. The cost of any appraisal shall be deducted from the fair market value to which the deceased Member's estate or beneficiary or beneficiaries is or are entitled. The Members may elect, by written notice that is provided to the deceased Member's estate or beneficiary or beneficiaries, within thirty (30) days after the Member's death, to purchase the deceased Member's Ownership Interest over a one-year (1 year) period, in four (4) equal installments, with the first installment being due sixty (60) days after the Member's date of death. The Company, or the other Members, in its or their discretion, may purchase insurance on the lives of any of the Members, with the company or the purchasing Member named as the beneficiary, as the purchaser may decide, and use all or any of the proceeds from such insurance as a source of proceeds from which the deceased Member's Membership Ownership Interest may be purchased by the Company.

**6.3 Restrictions on Transfer. Except** (i) as otherwise provided in this Article or (ii) upon the unanimous consent of all of the other Members, no Member shall sell, hypothecate, pledge, assign or otherwise transfer, with or without consideration, any part or all of his Ownership Interest in Company to any other person or entity (a "Transferee"), without first offering (the "Offer") that portion of his or her Ownership Interest in the Company subject to the contemplated transfer (the "Offered Interest") first to the Founding Member, and secondly, to the other Members, at the purchase price (hereinafter referred to as the "Transfer Purchase Price") and in the manner as prescribed in the Offer.

The Offering Member shall make the Offer first to the Founding Member by written notice (hereinafter referred to as the "Offering Notice"). Within twenty (20) days (the "Company Offer Period") after receipt by the Company of the Offering Notice, the Founding Member shall notify the Offering Member in writing (the "Founding Member Notice"), whether or not the Company shall accept the Offer and shall purchase all but not less than all of the Offered Interest. If the Founding Member accepts the Offer to purchase the Offered Interest, the Company Notice shall fix a closing date not more than twenty-five (25) days (the "Founding Member Closing Date") after the expiration of the Company Offer Period.

In the event the Founding Member decides not to accept the Offer, the Offering Member or the Company, at his or her or its election, shall, by written notice (the "Remaining Member Notice") given within that period (the "Member Offer Period") terminating ten (10) days after the expiration of the Company Offer Period, make the Offer of the Offered Interest to the other Members, each of whom shall then have a period of twenty-five (25) days (the "Member Acceptance Period") after the expiration of the Member Offer Period within which to notify in writing the Offering Member whether or not he or she intends to purchase all but not less than all of the Offered Interest. If two (2) or more Members of the Company desire to accept the Offer to purchase the Offered Interest, then, in the absence of an agreement

between them, such Members shall have the right to purchase the Offered Interest in proportion to their respective Unit Interests. If the other Members intend to accept the Offer and to purchase the Offered Interest, the written notice required to be given by them shall fix a closing date not more than sixty (60) days after the expiration of the Member Acceptance Period (hereinafter referred to as the "Member Closing Date").

The aggregate dollar amount of the Transfer Purchase Price shall be payable in cash on the Founding Member Closing Date or on the Member Closing Date, as the case may be, unless the Founding Member or the purchasing Members shall elect by written notice that is delivered to the Offering Member, prior to or on the Founding Member Closing Date or the Member Closing Date, as the case may be, to purchase such Offered Interest in four (4) equal annual installments, with the first installment being due on the Closing Date.

If the Founding Member or the other Members fail to accept the Offer or, if the Offer is accepted by the Founding Member or the other Members and the Founding Member or the other Members fail to purchase all of the Offered Interest at the Transfer Purchase Price within the time and in the manner specified, then the Offering Member shall be free, for a period (hereinafter referred to as the "Free Transfer Period") of sixty (60) days from the occurrence of such failure, to transfer the Offered Interest to a Transferee; provided, however, that if all of the other Members other than the Offering Member do not approve of the proposed transfer by unanimous written consent, the Transferee of the Offered Interest shall have no right to become a Member or to participate in the management of the business and affairs of the Company as a Member or Manager, and shall only have the rights of an Assignee and be entitled to receive the share of profits and the return of capital to which the Offering Member would otherwise have been entitled. A Transferee shall be admitted as a Member of the Company, and as a result of which he or she shall become a substituted Member, with the rights that are consistent with the Membership Interest that was transferred, only if such new Member (i) is approved unanimously by the Members; (ii) delivers to the Company his required capital contribution; (iii) agrees in writing to be bound by the terms of this Agreement by becoming a party hereto.

If the Offering Member shall not transfer the Offered Interest within the Free Transfer Period, his or her right to transfer the Offered Interest free of the foregoing restrictions shall thereupon cease and terminate.

**6.4  Involuntary Transfer or Bankruptcy of a Membership Interest.** A creditor's charging order or lien on a Member's Membership Interest, bankruptcy of a Member (whether voluntary or involuntary), or other involuntary transfer of Member's Membership Interest, shall constitute a material breach of this Agreement by such Member. The Member's Membership Interest shall revert back to the Company upon the occurrence of the events described in this Section 6.4. The Member's Membership Interest, once it reverts back to the Company, shall be owned, in full by the Company and the Member shall have no rights and no ownership in the Company. The remaining Members may purchase the Units that have reverted back to the Company based on either a. an informal agreement amongst the Members or b. at a price determined by an appraiser to value the reverted Units.

# ARTICLE VII

## ACCOUNTING, RECORDS AND REPORTING

**7.1 Books and Records.** The Company shall maintain complete and accurate accounts in proper books of all transactions of or on behalf of the Company and shall enter or cause to be entered therein a full and accurate account of all transactions on behalf of the Company. The Company's books and accounting records shall be kept in accordance with such accounting principles (which shall be consistently applied throughout each accounting period) as the Members may determine to be convenient and advisable. The Company shall maintain at its principal office all of the following:

A current list of the full name and last known business or residence address of each Member in the Company set forth in alphabetical order, together with, for each Member: the Ownership Interest, Percentage Ownership; a copy of the Certificate and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Certificate or any amendments thereto have been executed; copies of the Company's federal, state and local income tax or information returns and reports, if any, for the six most recent taxable years; a copy of this Agreement and any and all amendments hereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed; copies of the financial statements of the Company, if any, for the six most recent Fiscal Years; the Company's books and records as they relate to the internal affairs of the Company for at least the current and past four Fiscal Years; true and full information regarding the status of the business and financial condition of the Company; and true and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each Member and which each Member has agreed to contribute in the future, and the date on which each became a Member.

**7.2 Inspection of Books and Records.** Each Member has the right, on reasonable request for purposes reasonably related to the interest of the person as a Member or a Manager, to: (a) inspect and copy during normal business hours any of the Company's records described in Section 7.1; and (b) obtain from the Company promptly after their becoming available a copy of the Company's federal, state and local income tax or information returns for each Fiscal Year.

**7.3 Accountings.** As soon as is reasonably practicable after the close of each Fiscal Year, the Members shall make or cause to be made a full and accurate accounting of the affairs of the Company as of the close of that Fiscal Year and shall prepare or cause to be prepared a balance sheet as of the end of such Fiscal Year and a profit and loss statement for that Fiscal Year, to Members during such Fiscal Year, and any other statements and information necessary for a complete and fair presentation of the financial condition of the Company, all of which the Manager shall furnish to each Member. In addition, the Company Shall furnish to each Member information regarding the Company necessary for such Member to complete such Member's federal and state income tax returns. The Company shall also furnish a copy of the Company's tax returns to any Member requesting the same. On such accounting being made, profits and losses during such Fiscal Year shall be ascertained and credited or debited, as the case may be, in the books of account of the Company to the respective Members as herein provided.

**7.4 Filings.** The Members, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities. The Members, at Company expense, shall also cause to be prepared and timely filed with appropriate federal and state regulatory and administrative bodies amendments to, or restatements of, the Certificate and all reports required to be filed by the Company with those entities under the Act or other then current applicable laws, rules, and regulations. If the Company is required by the Act to execute or file any document and fails, after demand, to do so within a reasonable period of time or refuses to do so, any Member may prepare, execute and file that document with the Texas Secretary of State.

**7.5 Bank Accounts.** The Company shall maintain its funds in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be co-mingled in any fashion with the funds of any other Person.

**7.6 Tax Matters Partner.** The Founding Member shall be the Tax matter Partner, but the Members, in their exclusive discretion, may appoint, remove and replace a Tax Matters Partner at any time or times. The Members shall from time to time cause the Company to make such tax elections as they deem to be in the interests of the Company and the Members generally. The Tax Matters Partner, as defined in Internal Revenue Code Section 6231, shall represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings, and shall expend the Company funds for professional services and costs associated therewith.

## ARTICLE VIII

## DISSOLUTION AND WINDING UP

**8.1 Dissolution.** The Company shall be dissolved, its assets shall be disposed of, and its affairs wound up on the first to occur of: the entry of a decree of judicial dissolution pursuant to the Act; or the unanimous approval of the Members.

**8.2 Winding Up.** On the occurrence of an event specified in Section 8.1, the Company shall continue solely for the purpose of winding up its affairs in an orderly manner, liquidating its assets and satisfying the claims of its creditors. The Members shall be responsible for overseeing the winding up and liquidation of Company, shall take full account of the assets and liabilities of Company, shall cause such assets to be sold or distributed, and shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed as provided in Section 9.4. The Members shall give written notice of the commencement of winding up by mail to all known creditors and claimants whose addresses appear on the records of the Company. The Members shall be entitled to reasonable compensation for such services.

**8.3 Distributions in Kind.** Any noncash assets distributed to the Members shall first be valued at their fair market value to determine the profit or loss that would have resulted if such assets were sold for such value. Such profit or loss shall then be allocated pursuant to this Agreement.

**8.4 Order of Payment of Liabilities on Dissolution.** After a determination that all known debts and liabilities of the Company in the process of winding up, including, without limitation, debts and liabilities to Members who are creditors of the Company, have been paid or adequately provided for, the remaining assets shall be distributed to the Members in proportion to their ownership interest in the Company.

**8.5 Adequacy of Payment.** The payment of a debt or liability, whether the whereabouts of the creditor is known or unknown, shall have been adequately provided for if payment thereof shall have been assumed or guaranteed in good faith by one or more financially responsible Persons or by the United States government or any agency thereof, and the provision, including the financial responsibility of the Person, was determined in good faith and with reasonable care by the Members to be adequate at the time of any distribution of the assets pursuant to this Section. This Section shall not prescribe the exclusive means of making adequate provision for debts and liabilities.

**8.6 Compliance with Regulations.** All payments to the Members on the winding up and dissolution of Company shall be strictly in accordance with the positive capital account balance limitation and other requirements of Regulations Section 1.704-1(b)(2)(ii)(d), as the Members deem appropriate.

**8.7 Limitations on Payments Made in Dissolution.** Except as otherwise specifically provided in this Agreement, each Member shall only be entitled to look solely to the assets of the Company for the return of such interest in the company and shall have no recourse for such Member's share of profits (on dissolution or otherwise) against any other Member.

**8.8 Certificate of Cancellation.** The Members conducting the winding up of the affairs of the Company shall cause to be filed in the office of, and on a form prescribed by the Nevada Secretary of State, a certificate of cancellation of the Certificate on the completion of the winding up of the affairs of the Company.

## ARTICLE IX EXCULPATION

## AND INDEMNIFICATION

**9.1 Exculpation of Members.** No Member shall be liable to the Company or to the other Members for damages or otherwise with respect to any actions taken or not taken in good faith and

reasonably believed by such Member to be in or not opposed to the best interests of the Company, except to the extent any related loss results from fraud, gross negligence or willful or wanton misconduct on the part of such Member or the material breach of any obligation under this Agreement or of the fiduciary duties owed to the Company or the other Members by such Member.

**9.2 Indemnification by Company.** The Company shall indemnify, hold harmless and defend the Members, in their capacity as Members, Managers, or Officers, from and against any loss, expense, damage or injury suffered or sustained by them by reason of any acts or omissions arising out of their activities on behalf of the Company or in furtherance of the interests of the Company, including but not limited to any judgment, award, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding or claim, if the acts or omissions were not performed or omitted fraudulently or as a result of gross negligence or willful misconduct by the indemnified party. Reasonable expenses incurred by the indemnified party in connection with any such proceeding relating to the foregoing matters may be paid or reimbursed by the Company in advance of the final disposition of such proceeding upon receipt by the Company of (i) written affirmation by the Person requesting indemnification of its good-faith belief that it has met the standard of conduct necessary for indemnification by the Company and (ii) a written undertaking by or on behalf of such Person to repay such amount if it shall ultimately be determined by a court of competent jurisdiction that such Person has not met such standard of conduct, which undertaking shall be an unlimited general obligation of the indemnified party but need not be secured.

**9.3 Insurance.** The Company shall have the power to purchase and maintain insurance on behalf of any Person who is or was a Member or an agent of the Company against any liability asserted against such Person and incurred by such Person in any such capacity, or arising out of such Person's status as a Member or an agent of the Company, whether or not the Company would have the power to indemnify such Person against such liability under Section 10.1 or under applicable law.

# ARTICLE X

## MISCELLANEOUS

**10.1 Authority.** This Agreement constitutes a legal, valid and binding agreement of the Member, enforceable against the Member in accordance with its terms. The Member is empowered and duly authorized to enter into this Agreement (including the power of attorney herein) under every applicable governing document, partnership agreement, trust instrument, pension plan, charter, certificate of incorporation, bylaw provision or the like. The Person, if any, signing this Agreement on behalf of the Member is empowered and duly authorized to do so by the governing document or trust instrument, pension plan, charter, certificate of incorporation, bylaw provision, board of directors or stockholder resolution or the like.

**10.2 Indemnification by the Members.** Each Member hereby agrees to indemnify and defend the Company, the other Members and each of their respective employees, agents, partners, members, shareholders, officers and directors and hold them harmless from and against any and all claims, liabilities, damages, costs and expenses (including, without limitation, court costs and attorneys' fees and expenses) suffered or incurred on account of or arising out of any breach of this Agreement by that Member.

# ARTICLE XI DISPUTE RESOLUTION

**11.1 Disputes Among Members.** The Members agree that in the event of any dispute or disagreement solely between or among any of them arising out of, relating to or in connection with this Agreement or the Company or its organization, formation, business or management ("Member Dispute"), the Members shall use their best efforts to resolve any dispute arising out of or in

connection with this Agreement by good-faith negotiation and mutual agreement. The Members shall meet at a mutually convenient time and place to attempt to resolve any such dispute.

However, in the event that the Members are unable to resolve any Member Dispute, such parties shall first attempt to settle such dispute through a non-binding mediation proceeding.

**11.2 Mediation.** Mediation proceedings shall be conducted in accordance with the Commercial Mediation Rules of the American Arbitration Association (the "AAA") in effect on the date the notice of mediation was served, other than as specifically modified herein, and shall be non- binding on the parties thereto. Any Member may commence a mediation proceeding by serving written notice thereof to the other Members, by mail or otherwise, designating the issue(s) to be mediated and the specific provisions of this Agreement under which such issue(s) and dispute arose. The initiating party shall simultaneously file two copies of the notice with the AAA, along with a copy of this Agreement. A Member may withdraw from the Member Dispute by signing an agreement to be bound by the results of the mediation, to the extent the mediation results are accepted by the other Members as provided herein. A Member who withdraws shall have no further right to participate in the Member Dispute.

The Members shall select one neutral third party AAA mediator (the "Mediator") with expertise in the area that is in dispute. If a Mediator has not been selected within five (5) business days thereafter, then a Mediator shall be selected by the AAA in accordance with the Commercial Mediation Rules of the AAA.

## ARTICLE XII

## MISCELLANEOUS

**12.1 Notices.** Except as otherwise expressly provided herein, any notice, consent, authorization or other communication to be given hereunder shall be in writing and shall be deemed duly given and received when delivered personally, when transmitted by facsimile if receipt is acknowledged by the addressee, one business day after being deposited for next-day delivery with a nationally recognized overnight delivery service, or three business days after being mailed by first class mail, charges and postage prepaid, properly addressed to the party to receive such notice at the address set forth in the Company's records.

**12.2 Severability.** If any provision of this Agreement, or the application of such provision to any Person or circumstance, shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement, or the application of such provision to Persons or circumstances other than those to which it is held to be invalid or unenforceable, shall not be affected thereby.

**12.3 Binding Effect.** Subject to Article VII, this Agreement shall bind and inure to the benefit of the parties and their respective Successors.

**12.4 Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**12.5 Entire Agreement.** This Agreement contains the entire agreement of the parties and supersedes all prior or contemporaneous written or oral negotiations, correspondence, understandings and agreements between or among the parties, regarding the subject matter hereof.

**12.6 Further Assurances.** Each Member shall provide such further information with respect to the Member as the Company may reasonably request, and shall execute such other and further certificates, instruments and other documents, as may be necessary and proper to implement, complete and

perfect the transactions contemplated by this Agreement.

**12.7 Headings; Gender; Number; References.** The headings of the Sections hereof are solely for convenience of reference and are not part of this Agreement. As used herein, each gender includes each other gender, the singular includes the plural and vice versa, as the context may require. All references to Sections and subsections are intended to refer to Sections and subsections of this Agreement, except as otherwise indicated.

**12.8 Parties in Interest.** Except as expressly provided in the Act, nothing in this Agreement shall confer any rights or remedies under or by reason of this Agreement on any Persons other than the Members and their respective Successors nor shall anything in this Agreement relieve or discharge the obligation or liability of any third Person to any party to this Agreement, nor shall any provision give any third Person any right of subrogation or action over or against any party to this Agreement, except as provided in the Purchase Agreement(s).

**12.9 Amendments.** All amendments to this Agreement shall be in writing and signed by all of the Members at the time of the amendment.

**12.10 Attorneys' Fees.** In any dispute between or among the Company and one or more of the Members, including, but not limited to, any Member Dispute, the prevailing party or parties in such dispute shall be entitled to recover from the non-prevailing party or parties all reasonable fees, costs and expenses including, without limitation, attorneys' fees, costs and expenses, all of which shall be deemed to have accrued on the commencement of such action, proceeding or arbitration. Attorneys' fees shall include, without limitation, fees incurred in any post-award or post-judgment motions or proceedings, contempt proceedings, garnishment, levy, and debtor and third party examinations, discovery, and bankruptcy litigation, and prevailing party shall mean the party that is determined in the arbitration, action or proceeding to have prevailed or who prevails by dismissal, default or otherwise.

**12.11 Remedies Cumulative.** Subject to Article XI, remedies under this Agreement are cumulative and shall not exclude any other remedies to which any Member may be lawfully entitled.

**12.12 Jurisdiction and Venue/Equitable Remedies.** The Company and each Member hereby expressly agrees that if, under any circumstances, any dispute or controversy arising out of or relating to or in any way connected with this Agreement shall, notwithstanding Article XI, be the subject of any court action at law or in equity, such action shall be filed exclusively in the courts of the State of Texas or of the United States of America located in the counties of Harris, as selected by the Member that is the plaintiff in the action, or that initiates the proceeding or arbitration. Because the breach of the provisions of this Section would cause irreparable harm and significant injury to the Company and the other Members, which would be difficult to ascertain and which may not be compensable by damages alone, each Member agrees that the Company and the other Members will have the right to enforce the provisions of this Section by injunction, specific performance or other equitable relief in addition to any and all other remedies available to such party or parties without showing or proving any actual damage to such parties. Members will be entitled to recover all reasonable costs and expenses, including but not limited to all reasonable attorneys' fees, expert and consultants' fees, incurred in connection with the enforcement of this Section.

IN WITNESS WHEREOF, this Limited Liability Company Operating Agreement has been duly executed by or on behalf of the parties hereto as of the date first above written.

Mark Sheppard

_____

EXHIBIT A

LLC MEMBERS

A.  **Founding Member**

Name:

Mark Sheppard